Judge Brooke
assigned the following reasons for concurring in this decree.
lieved, (no doubt,) that, as it was a British debt, it couldr never be recovered. The complainant (the vendee) having paid oiF the mortgage, has an equitable title to have the amount deducted from his bond to the vendors ; and their assignment to the defendant does not place him in n better situation than that of the assignors. I concur in the opinion that the decree of the Chancel» lor ought to be reversed. Though Stockton was apprised of the mortgage to Smith tí? Co. he did not consent to take the land with that encumbrance. The covenant of the vendors does not except it; and the deed to the vendee contains an express warranty and covenant against all encumbrances. The vendors evidently preferred to take the claim of Smith &? Co. upon themselves to having its amount deducted from the purchase money ; they be-
Judge Fleming.
Whenever Í have the misfortune to differ in opinion from the majority of the Court, I feel great diffidence in my own judgment; though, in the case before us, I have the consolation to reflect that I concur with the venerable Judge, who pronounced the decree, and is now no more. Being of opinion that the decree, dismissing the bill of the appellant, is correct; and, consequently, differing from a majority of this Court, I shall briefly state some of the grounds on which my opinion is founded; and must premise a sound, and well-established maxim, that whoever comes into a Court of equity, to ask relief against the operation of the law, ought to appear with a pure conscience, and, first, do equity to ail parties concerned,
*72 Let us examine whether the appellant in this case has so conducted himself ? He states in his original bill, that the land, for the purchase money of which his bonds were executed, was, by Roberts, previous to his said purchase, mortgaged to fames Smith and Co. to secure the payment of a considerable sum of money. But finding, afterwards, where “ the shoe pinched,” and that the simple fact (though literally true) was insufficient for his purpose, and did not avail him, he, in his bill of review, added a very important assertion, to wit, that£t of this circumstance he was ignorant at the time of the purchase which assertion he knew to be false, and which is pointedly disproved by two respectable witnesses, whose credibility stands fair and unimpeached.
Samuel Calland deposes that, about the year 1706 or ’87, while Stockton and Roberts were on terms for the land, the former applied to the deponent, who was the agent of Smith Co. to whom the land was under a deed of trust or mortgage; that he delivered the papers respecting the land to Stockton, who kept them several weeks, and returned them, previous to his contract with the Roberts's, and made light of it; intimating to the deponent that he believed the British debts would never be paid; the mortgage having been made to secure the payment of a British debt. In answer to an interrogatory, put by Stockton by the witness, he said that he understood the bond had sold for an inconsiderable sum; but that Stockton hacl damn’d its credit by advertising it; and another reason why it sold so low was that it was not payable until more than three years and a half after the sale. And Cook, in his answer, says, he alwa ysintended that whatever money he might receive on the bond, more than sufficient to discharge Roberts's debt to him, (to secure the payment of which the bond was pledged,) should be restored to Roberts.
But to return to the notice. Drury Cross deposes that he had bargained with the Roberts's for the purchase of the land; when Stockton came to him at his own house, and *73 Informed him that it was under a mortgage to James Smith Co, And, wholly from what Stockton stated, in regard to the encumbrance that was fixed on the land, he declined his bargain ; and, in a few days thereafter, Stockton himself became the purchaser. Thus did he, by a subtle artifice, defeat Cross of the purchase, in order to secure it to himself; for, although the fact was true, that the land was under a mortgage to Smith id Co. yet, as his motive was to secure the purchase to himself, (which he, no doubt, knew to be an advantageous one notwithstanding the encumbrance,) it was a palpable fraud practised upon Cross. And, with a full knowledge of all these circumstances, in which he had been an artful and a principal actor, he had the address to prevail on the Roberts’s (either from their ignorance, or their necessities,) to covenant, in their deed of October, 1787, (which he, no doubt, had prepared himself,) that the said land, “at that time, was free and dear of and from all manner of encumbrances, and from the just claim of any person or persons whatsoeverand, as such, warranted the same to the purchaser, who, had he intended upright and fair dealing with the parties, should have deducted the sum, for which the land was mortgaged, out of the price, and paid, or given his bond or bonds for the balance; and taken a special warranty for the land, adapted to what he well knew to be the circumstances of the case.
It appears, too, from the exhibits and evidence in the cause, that, notwithstanding the mortgage which Stockton afterwards discharged, it was to him an advantageous purchase; for it appears by the deed of trust, or mortgage, that, in addition to the 246 acres purchased by Stockton, there was a tract of 220 acres adjoining, (which had been sold by Smith & Co. to Roberts,) comprised in the deed; making, in the whole, 466 acres; which latter tract of 220 acres was subject to contribute in due proportion, to discharge the sum for which the whole was mortgaged, to wit, 64l. 11s. 4d. And it is, also, in evidence, that Stockton sold a part of the 346 acres, (but *74 bow much thereof does not appear,) to one Hubbard, for five hundred dollars.
But, however that may be, I am of opinion that, if Stockton would avail himself of the warranty in the deed from the Roberts's, his remedy (if any he hath,) is against them ; though, according to the principles laid down by the Judges of this Court in the case of Grantland v. Wight, (a) they ought, in equity, to be relieved against their warrantyThe case alluded to was this : Wight sold to Grant-land a piece of ground, lying on a street in Richmond, by certain metes and bounds, marked out at the time of’ sale, which lot was supposed, and publicly advertised by Wight, to extend fifty feet on the street, but, on measurement, it fell short of thé distance, between 5 and 6 feet. Grantland, after his purchase, and with full knowledge of the deficiency in the ground, obtained from Wight a written contract to make him a title, in which was a covenant that the ground extended fifty feet on the street; when, in fact, it fell short upward of five feet. Grantland brought his bill to have a deduction in price of the ground; not pro rata, according to the deficiency, but claimed an extra deduction, alleging that the remainder of the ground was rendered of much less value, on account of the said deficiency. Wight contended, only, that the deduction should be in due proportion to the deficiency; but the Judges of this Court were unanimously of opinion that Wight. would have been relieved, altogether, against his covenant, had he sought such relief; although it was executed under his hand and seal; because Grant-land was apprised of the boundaries of the ground, though not of the quantity, at the time of the purchase ; and acquainted with the deficiency, at the time of the contract.
In the case before us, Stockton, at the time he obtained a covenant that the land was then free .and clear of and from all manner of encumbrances, and, as such, warranted to him, had perfect knowledge, (though expressly denied in his bill,) that it was under a deed of trust, or mortgage to Smith & Go. and had deceitfully availed him *75 self of that knowledge to wrest the bargain from Cross, and secure it to himself. The two cases are different in circumstances, but, in principle, appear to me the same.
There is abundant evidence in the record, that Stock-ion was a litigious, contentious man; and his conduct, throughout the transactions before us, appears to me replete with chicane, artifice, and want of candour. I therefore think him not entitled to countenance in a Court of equity ; and am, upon the whole, of opinion, that the decree is just, and ought to be affirmed : but, a majority of the Court thinking otherwise, the decree is to be reversed with costs, and the injunction made perpetual.

 2 Munf. p. 179.